## THORP *v.* HAMMOND.

1. When a vessel is sailing in close proximity to other vessels, the fact that her hands are engaged in reefing her mainsail is no sufficient excuse for failure to keep a lookout, or to take such precautions as are needful to avoid collisions.

2. One of several general owners, who sails a vessel on shares, under an arrangement between himself and the other owners, whereby he in effect has become the charterer, hiring his own crew, paying and victualling them, paying half the port charges, retaining half the net freight after the port charges are taken out, and paying the other half to the general owners, is to be considered the owner "*pro hac vice*," and, as such, is liable personally for a tortious collision with another vessel.

3. Though sued jointly with the other general owners, in a libel which does not describe him as owner *pro hac vice*, a decree may be made against him alone.

APPEAL from the Circuit Court for the Southern District of New York, in a libel *in personam*, for a collision between vessels at sea. The case was thus:

By an act of Congress of March 3d, 1851, it is enacted—

"*Section* 3. That the liability of the owners of any vessel for any loss, damage, or injury by collision, occasioned without the privity of such owners, shall in no case exceed the amount or value of the interest of such owners respectively in such vessel and her freight then pending.

"*Section* 5. That the *charterer* of any ship or vessel, in case he or they shall *man, victual, and navigate* such vessel at *his or their own expense*, shall be deemed the owner of such vessel, within the meaning of this act; and such ship or vessel, when so chartered, shall be liable in the same manner as if navigated by the owners thereof."

With this statute in force, three schooners—the Capes, the Huntley, and the Brothers—were sailing towards New York, along the New Jersey coast, not far from Sandy Hook. There was nothing special in the ownership of the first and last named of the vessels. The Huntley, however, was owned by one S. S. Hammond and eight others as general owners, Hammond alone sailing her; he doing this on

shares, hiring, paying, and victualling his own crew; paying
half the port charges, retaining half the net freight after-
wards, and paying to the general owners the remaining half.

The collision, which was the cause of this suit, occurred
on a winter morning of 1860. All three vessels were heavily
laden, and were sailing close-hauled, having the wind about
north-northwest, blowing fresh and fitfully. The general
direction of their courses was about the same. The vessels
were near each other, the Capes in advance, and perhaps
somewhat the most out toward·sea, the Huntley next, and
the.Brothers last and nearest to the shore. After sailing
thus from·eight in the morning until. after nine, the wind
having veered more northwardly, all the schooners tacked
toward the northeast, thus standing off shore. When the
Huntley tacked to stand out she lowered her mainsail in

order to take in reefs, but the Capes and the Brothers con-
tinued to carry the same sail they had carried before. In
consequence of this the Brothers passed the Huntley, though
on the leeward side, at the distance of about one hundred
yards, running at the speed of seven or eight knots, while

the speed of the Huntley, carrying her foresail and jib and falling to the leeward, was only four or five. All the vessels ran on the off-shore tack some fifteen or twenty minutes, which carried them about two miles out to sea. The Capes then went about and stood in shore on her starboard tack, the Brothers following very soon after. Whether the Brothers had beaten out her tack when she thus came about was not clear upon the evidence, though the weight of testimony perhaps tended to show that she had. However this fact was, before the Brothers could gather headway after tacking, the Huntley—running freely on the off-shore tack, four or five knots an hour, foresail and jib set—ran into her, head on, striking her abaft the main rigging, and causing her to sink in about half an hour. The diagrams on p. 409 will perhaps better illustrate positions at different times.

At the time of the collision, all hands on board of the Huntley were engaged in reefing the mainsail. When the Brothers tacked to stand in shore, the Huntley was astern of her, not less than five or six hundred yards, the Huntley being slightly to the windward. There was no look-out on the Huntley; no one on board of her saw the Brothers when she tacked, or when she was in stays, or noticed her at all after her tacking until it was too late to avoid the collision. Though hailed from the Brothers, and told to keep off, no attention was given to the hail, and the evidence left no doubt that had those in charge of the Huntley been watchful, had they seen the Brothers when she went about, it would have been entirely in their power, by porting their helm, to pass under the Brothers' stern.

The owner of the Brothers (Thorp) hereupon filed a libel in the District Court of New York *in personam*, against Hammond and the eight others, general owners of the Huntley, averring that the Brothers had been negligently run into and sunk by the Huntley, in consequence of the mismanagement of those on board the Huntley and in charge of her. The libel, which averred nothing about the ownership of the Huntley, except that she "was *owned by and in possession*

*of the respondents,*" claimed $12,000 damages, as the value of the Brothers.

The owners of the Huntley set up as defence:

I. That they were, in fact, only her *general* owners, and that she was commanded, sailed, and exclusively managed by Hammond, under an agreement made between him and them; that he was to have entire control and management of her as charterer on and for his own account; that he was the owner *pro hac vice* at the time of the collision, and, under the act of Congress of March 3d, 1851, alone responsible for the catastrophe.

II. That the entire value of the Huntley did not exceed $5000, and that her freight was but $424.

III. That on the merits, the Brothers was in fault herself.

1. In not beating out her tack.

2. In improperly turning about when the Capes turned about, whereby, with a slight variation of her helm, she could have easily passed under the stern of the Capes.

3. In that when the Brothers turned about on the inshore tack, and whose direction was across the Huntley's bow, the Brothers knew that the Huntley's crew were engaged in reefing her mainsail, by reason of which she was in a crippled condition, and that, in disregard of the rights and condition of the Huntley, the Brothers had placed herself in such a position as to render a collision inevitable. The respondents brought witnesses to show that it was a custom of the sea not to have a lookout in the daytime, and that it was the duty of all vessels to keep out of the way of a reefing vessel. But their evidence was contradicted by the libellants.

The District Court dismissed the libel. That court considered that as Hammond, a part owner, was on board, and had charge of the vessel at the time of the collision; as he had the exclusive possession and control of her, and manned, victualled, and navigated her at his own expense, he was to be deemed a charterer, within the meaning of the act of Congress, of March 3d, 1851, which exempted the owners from personal liability. And that as Hammond, the cap-

tain, was sued merely as a part owner, and not as the char-
terer, wrong-doer, or active cause of the disaster, and as his
liability was placed, by the libel, on the same ground as
that of the other owners, the suit necessarily stood or fell
as to all the respondents. The court therefore thought the
statute a bar to the suit in this form, and dismissed the libel.
This decree being affirmed by the Circuit Court, the case
was brought here on appeal.

 *Mr. McMahon, for the appellants:*

1. As respects the effect of the act of Congress of March
3d, 1851:

1st. Hammond is not to be regarded as charterer, or
owner *pro hac vice;* for he did not navigate the Brothers at
his own expense. Earnings were divided.

2d. It is not to be tolerated, even under the act of Con-
gress, that a person—the accredited and presumptive agent
of the general owners—whether part owner or not, who
navigates a vessel ostensibly as her master, shall screen his
general owners from liability for torts, under pretence that
he was in a position as to them that would relieve them of
their general liability.*

3d. In admiralty, parties who are injured by a collision
have been allowed to maintain their libel *in rem,* and also
their libel *in personam,* against different vessels and different
persons doing the injury complained of. In these actions
some defendants have been discharged, and others held
liable. Our case needs less than this.†

II. As to merits. The case is clear against the respon-
dents. The alleged custom on which the defence rests is
disproved, and would have been bad if proved.

 *Mr. R. H. Huntley, contra:*

I. The libellants cannot recover, because they have sued
the general owners of the colliding vessels *in personam;*

---

\* The Druid. Newton. 1 W. Robinson, 399.

† Newell *v.* Norton and ship, 3 Wallace, 266; Smith *v.* The Creole and
Sampson, 2 Wallace, Jr., 485.

whereas the vessel was not in their employ, was not managed or controlled by them, was not victualled or manned by them, and was not sailed by their agent, nor by a person in their employ. This is doubtless so on principles of common and admiralty law; but is made undeniably true by the act of Congress.

Although Hammond, the charterer, is made a party to the suit, yet he is so made as one of several owners, and not as charterer or special owner. He is not sued because he had charge of the vessel, or because he controlled her, but because he happened to have an interest in her as a general owner. Now as a general owner he is, under the act of Congress, not liable; and as a special owner he is not sued. No recovery can therefore be had against him in this libel.

As to the suggestion that the respondent, Hammond, should be held solely liable in this action, it is sufficient to say that the libellants have not asked that such liability be decreed in either of the courts below; no amendment has been suggested by them, and they are here upon the same pleadings on which they originally based their claim.

II. As to the merits. As we understand the evidence, the Brothers had not beaten out her tack. If this is so *she* was clearly the cause of the collision. She should have gone on; she would not have struck the Capes, but would have gone astern of her; neither would she have come across our bows, which she did. The Brothers was under full sail and perfectly manageable, while the Huntley was under head sails only, and was reefing. In such position she was crippled, and was to be considered and treated as a favored vessel.

No special lookout is kept in daylight on a little schooner, or while reefing. This we think our witnesses show. The helmsman and every man on deck is a lookout. The Huntley was reefing her mainsail, and this act required all her men. The Brothers knew both facts.

Mr. Justice STRONG delivered the opinion of the court.

It is plain, as respects the merits of this suit, that the col-

lision was the result of gross carelessness in the management of the Huntley. Knowing, as the master did, that there were two schooners in close proximity to his own; knowing also, as he must have known, that they were beating out their tacks, and would probably soon come about and put in shore, there can be no excuse for his failure to keep watch of their movements and to notice the change of course by the Brothers in season to port his helm and thus pass under her stern. That the hands on the Huntley were engaged in reefing the mainsail certainly did not relieve her from all obligation to observe the commonest precautions against inflicting an injury upon a neighboring vessel ahead, especially when the movements of that vessel were precisely what ought to have been anticipated.

The respondents, however, insist that it is a custom of the sea not to have a lookout in the daytime, or while reefing, and they have produced witnesses to prove such a custom. But the evidence falls far short of showing that such a custom exists generally, and if it were proved, it would not be a reasonable one, sufficient to justify the absence of a lookout in such a case as this when the Huntley was in close proximity to two other vessels, both beating to the windward, and one of them at least expected soon to cross her bow.

It has not been claimed that the collision was the result of inevitable accident, without fault, but the respondents contend that it was due to the mismanagement of the Brothers, rather than to that of the Huntley. Their argument is that the Brothers was under full sail and perfectly controllable, while the Huntley, being under head sails only, with her hands engaged in reefing, was a crippled vessel, and therefore one to be favored. Hence it is inferred that it was the duty of the Brothers to keep out of the way. It may be conceded that when two vessels are approaching each other, the one crippled and the other in good manageable condition, it is the duty of the latter, if possible, to give way to the former. But the Huntley can in no sense be said to have been a crippled vessel. She was running freely on her

off-shore tack, four or five knots an hour, with her foresail and jib set. She obeyed her helm perfectly, and though she may not have been able to come about as easily as she would had her mainsail been set, there was not the slightest difficulty in the way of her taking care of herself and avoiding collision with other vessels. The most obvious manœuvre, that of porting her helm, was not embarrassed at all by the fact that her mainsail was not spread.

It is further urged that the Brothers had not beaten out her tack when she came about, and, hence, that her putting her helm down and turning in shore when she did was a fault which, by throwing her in the way of the Huntley, caused the disaster. Was it, however, a fault? It is by no means clear, from the evidence, that the Brothers had not beaten out her tack fully. On the contrary, the evidence that she had, appears to us to preponderate. But, whether she had or not, it is fully proved that her coming about when she did was rendered proper, if not necessary, by the fact that the Capes changed to the starboard tack. The Capes was the leading vessel, and while it is possible that the Brothers might have ported her helm and gone astern of her, it is obvious that the safer course was to tack when the Capes tacked. And there was no reason to apprehend that the Huntley, following astern at the distance of five or six hundred yards, and very little, if at all, at the windward, would be embarrassed by her tacking. She had passed the Huntley close on the latter's lee side, at a distance of not more than one hundred yards, and the Huntley, carrying on her foresail and jib, had been constantly falling off to the leeward. Abundant sea-room was, therefore, left for the following vessel. It required only that the Huntley's helm should be ported half a point to carry her safely past the Brothers. We think, therefore, the whole fault of the collision is justly chargeable to the Huntley.

It remains to inquire, whether the respondents, or any of them, are personally responsible for the injury. They were all general owners of the schooner at fault at the time when

the collision occurred, but the evidence shows that she was commanded, sailed, and exclusively managed by S. S. Hammond, one of them, under an arrangement made between him and the other owners, whereby he had in effect become the charterer of the vessel, to be employed on his own account, without the management, control, restraint, or possession of the other owners. He sailed the vessel on shares, hiring his own crew, paying and victualling them, paying half the port charges, retaining half the net freight after the port charges were taken out, and paying to the general owners the other half. It is clear, therefore, that he must be considered as having been the owner "*pro hac vice.*" This accords with the authorities generally.* Notwithstanding this, however, and though Hammond was the special owner, it has been contended on behalf of the libellants that all the general owners are liable for the *torts* committed by the schooner while she was thus let to charter. The Circuit Court was of opinion that they are not, and this court is equally divided upon the question.

But we are all of opinion that the owner *pro hac vice* is liable, and that he may be charged in this proceeding. The court below held that he had been sued merely as a part owner, not as the charterer, wrong-doer, or active cause of the disaster, and that as his liability was placed by the libel on the same ground as that of the other owners, the suit must stand or fail as to all the respondents, and they held the act of March 3d, 1851, a bar to the suit in the form in which it had been brought. The court, therefore, dismissed the libel. This, we think, was an error. The act of March 3d, 1851, enacts, by its 5th section, that the charterer or charterers of any ship or vessel, in case he or they shall man, victual, and navigate such vessel at his or their own expense, or by his or their own procurement, shall be deemed the owner or owners of such vessel within the meaning of the act. The previous section had declared what shall be

---

* Hallet *v.* The Columbian Insurance Company, 8 Johnson, 272; Webb *v.* Peirce, 1 Curtis, 104; Thomas *v.* Osborn, 19 Howard, 22. See also act of Congress of March 3, 1851, § 5, 9 Statute at Large, 636.

the liability of owners for collisions. Hammond, therefore, is to be regarded as the owner, because the charterer, and as such responsible for the tortious acts of the vessel. If the other general owners are not, he is. The libel, it is true, avers that all the respondents were owners at the time of the collision. It does not set forth whether they were general or special owners. Such an averment was unnecessary, for it is immaterial to their liability whether they were one or the other, if they had the possession and control of the vessel. It is ownership which determines the liability, and an averment of the mode in which ownership was acquired would be superfluous. Had Hammond been sued alone, as he might have been, the libel need not have averred more respecting his ownership than is averred now. It would have been of no importance to set out whether he became owner by purchase of the schooner, or by bequest, or by charter-party, for his liability would have been as fixed in each case as in the others. Nor does the libel in this case charge general ownership, as distinguished from owner-ship *pro hac vice*, or ownership as defined by the statute. There is nothing, then, in the structure of the libel which stands in the way of a recovery against Hammond as owner, unless it be that others are also sued with him. And surely that is no bar to a recovery against him. The libel is for a tort, and tortfeasors are jointly and severally responsible. At common law, when several are sued, there may be a recovery against one alone, or against more than one, and less than the whole number. We know of no reason for a different rule in admiralty, and it is in accordance with admiralty practice to decree against one of several respondents to a libel for a tort, and to discharge the others.[*]

Our opinion, therefore, is, that even if the libel was rightly dismissed as to all the respondents except Hammond, the libellants are entitled to a decree against him.

DECREE REVERSED, and the record remitted with instruc-

---

[*] Newell *v.* Norton and Ship, 3 Wallace, 257; Smith *v.* The Creole and Sampson, 2 Wallace, Jr., 485.

tions to order a reference to ascertain the damages, and to decree that the libellants recover against Hammond.