THE NORLAND.

LOE v. GOLDSTEIN et al.

No. 8862.

Circuit Court of Appeals, Ninth Circuit.

Feb. 23, 1939.

George B. Grigsby, of Juneau, Alaska, and E. Coke Hill, of San Francisco, Cal., for appellant.

H. L. Faulkner and N. C. Banfield, both of Juneau, Alaska, and John L. McNab, of San Francisco, Cal., for appellees.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This is an appeal from a judgment of the District Court entered upon a directed verdict in favor of appellees in an action brought by appellant for damages for injuries received by him while he was fishing on the "Norland". Appellant brought suit in the District Court against the appellees, owners of the "Norland" under the provisions of Section 33 of the Merchant Marine, or Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688. Thereafter, on November 25, 1935, the appellee owners filed in the District Court their petition for a limitation of liability under the provisions of Sections 4283 (as amended August 29, 1935 and June 5, 1936), 4284, and 4285 (as amended June 5, 1936) of the Revised Statutes, 46 U.S.C.A. §§ 183, 184 and 185.

Thereafter the appellant filed in said limitation of liability proceeding his claim for damages on account of his injuries, and his answer to said petition for limitation of liability and setting up his cause of action for damages. Subsequently it was stipulated by the respective parties that the claimant, Pete Loe, conceded the right of petitioners to limitation of liability, also that the law action of Pete Loe be dismissed, and that all issues raised therein, as well as those raised in the limitation of liability suit, be adjudicated in the latter proceeding upon the pleadings therein, and that the case be tried before a jury.

At the trial it was brought out that appellant had worked on the "Norland" for

four or five fishing seasons. During the season in which the injury occurred he had made two trips prior to that on which the accident happened. It appears that on the first of these trips one Berglund was master of the "Norland", but that he was discharged on its termination. Loe testified that Berglund had hired him to go out that season. On Berglund's discharge Goldstein hired Bob Ball as captain. Appellant testified that he was hired by Bob Ball to go on subsequent trips. He also testified to a conversation had with Goldstein before he went on his first trip with Ball. In the course of the conversation he was told that Ball was to be master. Goldstein also said: "You are pretty well experienced, so you go with Ball, him in charge of the boat—to help him along. You know the fishing grounds." In one instance Goldstein testified that the law requires that the captain be an American citizen; that Loe was not an American citizen; that Loe would have taken the boat as captain of her himself had he been a citizen, but not being a citizen and knowing the ground he was put in charge of the fishing, i. e., he was "fish boss"; that he was selected as fish boss by either Bob Ball or by Goldstein himself. Elsewhere Goldstein testified that "the crew hired him [Loe] as fish boss, designated him as boss to run the fishing game".

Loe testified that "the regulation of method of fishing on shares is done through the Union, the Fishermen's Union". Goldstein testified: "The nature of the compensation and everything like that is left to the union rules and the conditions of the employment". An exhibit was put in evidence and identified as a copy of the mentioned rules or regulations. The exhibit is captioned: "Agreement between the Fishing Vessel Owners' Association, Inc., and the Deep Sea Fishermen's Union of the Pacific". In pertinent substance the agreement provides: That all members of the crew except the captain shall be members of the Union; that the "share of the vessel shall be one-fifth of the gross stock", lost gear having first been deducted; that fishermen are to pay their share of "grub", fuel, ice and bait and replace lost and condemned fishing gear; that one fisherman, approved of by the captain, shall attend to the weighing of the fish, and that he shall, in the captain's absence, assume all responsibility; that settlement is to be made between the captain or his agent and the fishermen when the trip is ended; that after bills (apparently meaning unpaid expenses of the particular trip for which settlement is being made) are paid back bills (apparently referring to unpaid bills accrued as the result of a non-profitable trip) are to be paid by deducting from each fisherman's share, one half of the sum by which the share exceeds $25, no deductions to be made if the share is $25 or less; that if the captain decides to fit out on a cash basis he may use the proceeds of the voyage for such purpose, in which case the crew shall receive their share of whatever discount may be allowed (apparently referring to such discount as may be granted by the purveyor of supplies for cash payment therefor); that "hole bills" (apparently back bills resulting from a non-profitable trip) are not collectable from the fishermen under certain circumstances as where the vessel is a total wreck; that a delegate is to be elected in each vessel who shall check up the bills with the goods when stores are received; that the fishermen are to pay for a watchman except that if watchman's fees are incurred because the vessel is "delayed by repairs or neglect of captain or owners, the vessel shall pay for the watchman"; that the captain and the delegate shall determine if watchmen are needed in small outside ports; that all disputes between the crew and the captain that cannot be settled on board shall be referred to the association and the union for adjustment, immediately upon arrival in port where the association and the union have offices.

In addition to the "Agreement" just summarized, there is other evidence as to the arrangement under which Loe was on the "Norland". Loe testified that: " * * * We work on shares. The boat's share comes first, it is twenty per cent. Then expenses are taken out, grub, bait, ice, fuel. In case of loss of gear that is taken out. After that expense is taken out the crew share the rest." Later on Loe testified: " * * * As to fishing on shares the captain on the boat, if he is a hired captain, gets ten per cent extra, sometimes more. I don't know what the captain got on this boat. I know I got five per cent extra." Still later Loe testified: "I got five per cent of the boat's share in addition to my share as a member of the crew. That was for being fishing boss."

Goldstein testified that: "The arrangements under which this boat has been engaged in fishing halibut, was engaged in

1934, between the owners and the fishermen who fished it, and the crew was, we furnished the boat, the gang on the boat furnished all expenses. I did not direct them where to go fish nor when to go to fish nor where to take their fish, nor when to sell them. The crew on the boat decided that: * * * They sell their fish wherever the crew decided to sell. * * * I had nothing to do with purchasing supplies, grub or food for the men, nor equipment of any kind." Goldstein further testified in referring to the division of the proceeds of the catch on the trip just preceding that on which Loe was injured, that each man on board the boat received $97.54 for his share after the deduction of the boat's share, expenses, etc., except "Bob Ball and Pete Loe. * * * They received five percent of the boat's share for running the boat". [Reference to the exhibit from which Goldstein was testifying as to the division on this trip clarifies the testimony and shows it to mean that Loe and Ball each received five percent of the boat's share in addition to receiving fishermen's shares.]

Goldstein also testified that: "* * * Neither I nor my joint owner, Captain Sandvick, had any control over the Norland or the master or crew from the time she left on a fishing venture until she returned. She was not controlled by any order given by me or my co-owner before her departure." As to the selection of the crew Goldstein testified that: "As a rule a captain on the boat selects the crew. In this particular instance the captain on the boat selected the crew. I have had captains on the boat refuse to take men I have recommended aboard the ship. * * * In this case I had no recommendation at all." On the same subject Goldstein also testified that: "In this case I wouldn't say if the captain hired all the men, that is asked them if they would join or if—I did not have anything to do with hiring the crew, or anything to say as to who should be hired as a crew. Nor power to veto the hiring of any member of the crew."

Tom Sandvick, co-owner of the "Norland", testified that the skipper and not the owner controls the vessel as to where to go to fish and where to dispose of the fish; that these matters are talked over between the crew and the skipper. On this point Loe testified that the owners of the boat do not direct where it is to go; that on the trips when he was fishing boss he and Ball on talking things over decided where to fish; that the crew as a whole decided where to sell the fish.

Pete Johnson, one of the fishermen on board during the two trips during which Loe was fishing boss, testified that: "* * * I understood that Bob Ball held the papers on the boat and Pete Loe was fish boss, and we all took orders from him. He told us where to fish and when, where to go, what time to leave town, what to bait up, what time we would haul, what time we would be ready to go home. It is customary for the man in charge to keep the log, but in this case Pete Loe kept the log himself, he was in the pilot house most of the time we were fishing." He also testified that Bob Ball had told him "they were a man short; Pete Loe was going to take her out, asked if I wanted to go". That he understood Loe was master until after he boarded the ship.

The evidence reveals that the accident causing the injury for which damages are sought occurred in the after-cabin where appellant bunked. Appellant was thoroughly familiar with the vessel, the after-cabin and the presence in the after-cabin of a hatch. The hatch, which is inset and level with the floor, is over the couplings of the drive shaft. The cabin is entered by a stairway leading from the deck. An incline step over a shaft leads from the lower step to the floor of the cabin. The hatch is located about fifteen inches from the end of the incline. Loe testified that he never saw the hatch open while the vessel was at sea. Johnson testified that the hatch cover was off quite frequently.

On the occasion in question, Loe, as was customary, descended the stairs backwards. The cover was off the hatch and Loe stepped in the opening, was caught in the machinery and severely mangled. At the time of the accident the vessel was proceeding at full speed and rolling considerably. Just prior to the accident Loe and the engineer, Pete Johnson, were both in the pilot house. Johnson went down to the after-cabin and took off the hatch cover to see if water had collected in the after bilge. Finding water present, he went to the engine room to start the pump, leaving the hatch cover off. He testified that he left the hatch unguarded in reliance on a statement made by Loe that he was going forward to get a cup of coffee; that he would not have left the open hatch for a second if he had not thought Loe was drinking a cup of coffee. He did not tell Loe that he was going to take the hatch

cover off. Loe went forward to get the coffee and had returned aft to go to bed when the accident occurred.

On the conclusion of the testimony appellees moved for a directed verdict. One ground offered to support the motion was that the evidence showed that Loe was not in the employ of the owners of the "Norland", but was fishing under a lay or upon shares, pursuant to what is known as a joint adventure. The court prior to granting the motion said: "I can't see on what theory the owners could be liable under such an arrangement as has been testified to here, where they had no control over the fish, no control over the crew, nothing to do with its hiring; nothing to do with the fish after they are caught or [nothing to] say [as to] what price they should be sold for or where they should be sold or anything else."

Section 33 of the Merchant Marine Act, 41 Stat. 1007, 46 U.S.C.A. § 688, provides, so far as here pertinent, that: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply. * * * Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

It is evident that an injured seaman is granted a cause of action by the foregoing section only against one as to whom he occupies the conventional relationship of "employee". Cromwell v. Slaney, 1 Cir. 1933, 65 F.2d 940, 941; cf., Robinson v. Baltimore & O. Ry. Co., 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849; Hull v. Philadelphia & R. Ry. Co., 252 U.S. 475, 40 S.Ct. 358, 64 L. Ed. 670. It follows that the direction of the verdict against Loe in this case was improper unless there was no evidence from which the jury could properly have found that an employer-employee relationship existed between Loe and the owners of the "Norland". Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Collins v. Streitz, 9 Cir.1938, 95 F.2d 430, 433.

The evidence which we have recited leaves it far from clear as to what was the precise legal relationship that existed between the parties. Appellant's theory seems to be that the captain of the Norland was a mere agent of the owners for the purpose of taking out the vessel; that the crew members in turn were hired by the captain as agent of the owners, their wages to be a percentage of the catch rather than a fixed sum; that the authority of Loe as fish boss and the fact that he was entitled to a percentage of the boat's share is only indicative that he, like the captain, was a supervisory agent of the owners charged with duties additional to those assumed by the crew generally. Appellees' position, so far as it is affirmative, is that Ball and Loe were joint charterers of the boat and thus owners pro hac vice; that consequently the crew was in their employ rather than in that of the general owner; that Loe's authority was due to his position as charterer, and that the five percent of the boat's share received by him was not payment from the owners but an amount retained by Loe as charterer. It is argued that the owners were never entitled to the catch, which was owned by the charterers, but had only a right to receive from the charterers ninety percent of one-fifth thereof, which one-fifth was loosely designated the "boat's share".

We think it should have been left to the jury to determine whether or not Loe was in the employ of the appellees. The test of whether a charter is a complete demise of a vessel so as to make the charterer owner pro hac vice is whether entire command and possession of the vessel, and consequent control over its navigation, has been surrendered to the charterer. 58 C.J., Shipping, § 224, p. 152. Retention by the general owner of such command, possession and control is incompatible with the existence at the same time of special ownership in the charterer.

In the present case it is clear that the evidence does not require a finding that the vessel was demised either to Ball or to Ball and Loe jointly. Goldstein testified that "the selection of the person to act as captain was in the hands of the owner at all times, that he could at the end of any trip discharge him for reasons". He also testified that he "would pick out a good man and ask if he wanted to go as captain. That would be the entire contract". Again he testified that the arrangement he had with Captain Ball was "he was to take out papers in the Customs office, being a citizen, and act as master of the boat, under the orders of Mr. Loe". It is true that Goldstein also testified that: "Neither I nor my joint own-

er, Captain Sandvick had any control over the Norland or the master or crew from the time she left on a fishing venture until she returned. She was not controlled by an order given by me or my co-owner before her departure." However, this statement is clearly inconsistent with that just quoted that Ball was to act as master under the orders of Loe, and with the undisputed testimony of Loe that Goldstein told him to go along with Ball "him in charge of the boat —to help him along".

The foregoing evidence as to the arrangement between the owners, Ball and Loe seems at least as consistent with a conclusion that Ball and Loe were the agents of the owners aboard the "Norland" as with the conclusion that either or both had become owner pro hac vice of the vessel. Additional evidence tending to the conclusion that they were agents rather than charterers is that relating to the method by which they were compensated. Goldstein testified they each "received five percent of the boat's share for running the boat". This seems indicative that in the view of the owners they were paid out of the owners' share for duties performed by them on the boat rather than themselves retaining a part of the proceeds of the catch to compensate for risks assumed by them as owners pro hac vice.

Nor does the evidence require a finding that there was a surrender by the owners of control of the vessel to the crew. In the first place, the evidence shows that the captain was selected by the owners and not by the crew. Rather than the crew chartering the boat and then selecting a captain to navigate her, as would be the normal procedure in the case of a demise, the evidence shows that the captain having been selected by the owners, he in turn collected a crew. For example, Pete Johnson was "hired" by Ball after Ball had been appointed captain by Goldstein. Secondly, once a crew had been organized it seemed to have been the general practice, and that followed here, (as disclosed by the testimony of Johnson and Sandvick) for the captain (in the precise case the captain and the fish boss) to determine where to go to fish, and when to return. The crew did seem to have a voice in determining where the fish were to be disposed of, but this fact does not require a finding of a demise of the vessel to them. Thirdly, the union agreement in several instances recognizes a divergency of interest as between the crew and the captain, as by

the provision that watchmen's fees incurred because of delay in sailing due to neglect of the captain are to be paid for by the vessel.

This evidence, revealing as it does that the crew did not have control of the vessel, prevents our saying as a matter of law that the crew were owners pro hac vice of the "Norland". Also, the facts just recited, with others, showing lack of control by the crew of the prosecution of the venture stand in the way of our saying, as a matter of law, that the crew and the owners, or the crew, captain, fish boss, and owners, were joint adventurers in the prosecution of the venture. It is true that certain of the facts before us point to the existence of some such relationship between the parties. For example, loss resulting from lost or destroyed gear was shared by all parties, since the amount thereof was deducted from the gross catch before division. On the other hand, the crew supplied the provisions, bait, ice and fuel and apparently alone were responsible for payment therefor, regardless of whether the proceeds of the particular trip were sufficient to meet the expense or not. Also, risk of loss of the vessel seems to have been borne by the master. Thus there seems in general to have been contemplated a division of items of loss, rather than a sharing of the loss as a whole. The loss feature of the arrangement seems more compatible with the existence of an agreement by the owner to allow the use of the vessel for a fishing trip to be conducted by his agents than with a joint adventure between the parties. Also inconsistent with the theory of joint venture is the indication in the testimony of Pete Johnson that the crew was controlled as to where the fishing was to be done, the labor to be performed, and even as to the manner of the performance of their labor, by the orders of Loe and Captain Ball. Cf., Domandich v. Doratich, 165 Wash. 315, 5 P.2d 310; Glaser v. Katalinich, 169 Wash. 133, 13 P.2d 468. This last factor points to the existence of an employer-employee relationship between the owner and crew. See, also, U. S. v. Laflin, 9 Cir. 1928, 24 F.2d 683, 685.

We find nothing in the cases cited by appellees which requires our holding as a matter of law that the evidence in this case would be inconsistent with a finding by the jury that the relationship of employer and employee existed between Loe and the owners. The decision in The Carrier Dove, 1 Cir. 1899, 97 F. 111, was based on the fact that in that case the master by his contract

had become owner pro hac vice, and the court merely applied the settled rule that in such case the crew cannot look to owners personally. In the present case, as seen above, the contract terms are not so definite as to require a finding that any party or parties had become owner pro hac vice.

Cromwell v. Slaney, supra, cited by appellees, lays down as a general rule that: "Where the captain employs the members of the crew and controls all the operations of the vessel, both in purchasing supplies for the voyage, in determining where he will fish, how long, and in disposing of the catch and settling all the bills, he becomes the owner pro hac vice, and that the crew is in the employ of the master and not of the owner." Page 941. That this is a valid test of the existence of ownership pro hac vice is not doubted, but the existence of the rule does not obviate the necessity in each case of examining the facts in order to determine whether in the particular instance control of "all the operations of the vessel" has been surrendered. This is made clear in Judge Bingham's concurring opinion in the Slaney case, supra, where it is pointed out that since in that case the master was paid a percentage of the owner's lay it was open to the jury to find that the owner did not let the boat to the master, but that the master was the owner's agent for taking charge of the boat, hiring the men, conducting the fishing trip, and dividing the proceeds as agreed.

Thorp v. Hammond, 79 U.S. 408, 12 Wall. 408, 20 L.Ed. 419, is of no help in the determination of the present case. There the evidence revealed that the master was part owner of the vessel; that he employed her on his own account without the management, control, restraint or possession of the other owners; that he sailed the vessel on shares, hiring his own crew, paying and victualing them; that he paid half of the port charges, retaining half the net freight after the port charges were taken out and paying to the general owners the other half. Under such circumstances it was clear, as held by the Court, that the master was owner pro hac vice, but that is not to say that in this case, where the facts are so very different, that an owner pro hac vice was substituted for the general owners.

So with the other cases cited by the appellees, their facts show clearly that the general owners had surrendered entire control, direction and management of the vessel to the master, whereas in the present case

the facts give rise to conflicting inferences as to the surrender of control. We must conclude that the action of the trial court in directing a verdict for defendant cannot be sustained on the ground that the jury could not have found from the evidence that Loe was an employee of the owners.

■ What we have said as to the relationship of Loe to the owners suffices also to answer a contention made in passing in appellees' brief that the direction of a verdict for defendant was required because the negligence sought to be imputed to the owners is that of a member of the crew who could not be hired or fired by them. If, as is permissible, the jury were to find that Ball and Loe were employees of the owners, it follows that they could also find that the crew members were employees of the owner, indirectly hired and fired by the owners through the agency of the master. In such case the owner would be liable for the negligent acts of crew members.

Appellees also argue that even if it be assumed that appellant was employed by appellees, the verdict was properly directed against him because the evidence requires a finding that he assumed the risk.

■ Prior to the enactment of the Jones Act the maritime law permitted no recovery for injuries resulting from the negligence of a fellow servant or the master, though seamen so injured were entitled to maintenance and cure at least as long as the voyage continued. The Osceola, 189 U. S. 158, 23 S.Ct. 483, 47 L.Ed. 760. However, the Jones Act, by its adoption for the maritime law of the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., specifically imposes liability for negligence of officers and employees, as well as for defects in equipment due to negligence. Beadle v. Spencer, 298 U.S. 124, 128, 56 S. Ct. 712, 80 L.Ed. 1082. The Federal Employers' Liability Act by its terms eliminates in all cases the defense of contributory negligence as a bar to recovery (45 U.S.C.A. § 53) and also eliminates the defense of assumption of risk where the violation by the common carrier of a statute enacted for the safety of employees contributes to the injury (45 U.S.C.A. § 54). It has been held in applying the Act in suits brought by railroad employees, that the elimination of the defense of assumption of risk in one class of cases evidences an intent that in all other cases such assumption is to have its common law effect as a complete bar to the action. Seaboard Air Line Ry. v. Horton, 233 U.S.

492, 34 S.Ct. 635, 58 L.Ed. 1062, L.R.A. 1915C, 1, Ann.Cas.1915B, 475.

However, in cases arising under the Jones Act where injury to a seaman resulted from injuries caused by unseaworthiness of the vessel, which term embraces defective appliances appurtenant to the ship, the Supreme Court has held that assumption of risk is no defense. The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075; Beadle v. Spencer, supra. And this rule has recently been applied in a case where the seaman chose to use an unsafe appliance instead of a safe method of doing his work, which was known to him. Socony-Vacuum Oil Co., Inc., v. Herbert A. Smith, Jr., 59 S.Ct. 262, 83 L.Ed. ——, January 3, 1939. These holdings have been based at least in part, upon the ground that under the admiralty rule a seaman could recover indemnity for injuries due to unseaworthiness of a vessel without qualification as to assumption of risk, and that the Jones Act, being remedial in nature, was not to be taken to narrow the protection afforded seamen by admiralty. The Arizona v. Anelich, supra, page 123, 56 S.Ct. page 711.

It has not, however, been decided whether assumption of risk is a defense in an action brought under the Jones Act where the negligence of a fellow servant is the contributing cause. Since admiralty gave no recovery for injury resulting from the negligence of a fellow servant, beyond cure and maintenance, it may be that in the case of a seaman, as in the case of railway employees, assumption of risk is a defense under such circumstances. It is not now necessary for us to decide this point, for even though it may be assumed that assumption of risk would be a good defense we do not think the evidence required a finding that in this case the risk was assumed.

 The federal rule is that the doctrine of assumption of risk has no application when the negligence of a fellow servant which the injured party could not have foreseen or expected is the cause of the injury, unless the danger arising therefrom is so obvious that an ordinarily careful person under the circumstances would observe and appreciate it. Seaboard Air Line Ry. v. Horton, supra. And the rule is not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care for his safety until notified to the contrary. Chesapeake & Ohio R. Co. v. De Atley, 241 U.S. 310, 36 S.Ct. 564, 60 L.Ed. 1016.

In the present case there being no evidence that Loe knew that the hatch cover had been removed, and the evidence not compelling a finding that an ordinarily careful person would have observed that fact, the jury would not be required to find that Loe had assumed the risk.

The judgment is reversed and the case remanded to the District Court for a new trial.