## THE METTACOMET.

(District Court, D. Massachusetts. August 12, 1915.)

### No. 1029.

1. SEAMEN ⬡⇒18—WAGES—EXTRA—MEMBERS OF FISHING CREW—LIABILITY OF VESSEL.

The extra wages due a cook on a fishing vessel, where all hands ship on the lay, but the cook is to receive an "extra" of a certain sum per day or month, are a preferred charge against the catch, and in the absence of any different agreement the vessel is not liable therefor, where there was no catch.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 76–82; Dec. Dig. ⬡⇒18.]

2. PARTNERSHIP ⬡⇒32—SEAMEN ON LAY—LIABILITY FOR ADVANCES TO MASTER —"PARTNER."

Where the owner of a vessel lets her to a master for a fishing voyage on a lay by which the master and crew are to pay all running expenses, and the master ships his own crew, they are not partners with the master in the enterprise, so as to be liable with him for advances made to him by the owner for running expenses.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 34; Dec. Dig. ⬡⇒32.

For other definitions, see Words and Phrases, First and Second Series, Partner.]

In Admiralty. Suit by R. H. Holmes against the schooner Mettacomet. Decree for respondent.

Richard H. Wiswall and John R. Lazenby, both of Boston, Mass., for libelant.

J. M. Marshall, of Gloucester, Mass., for claimant.

MORTON, District Judge. This is a libel in rem to recover from the fishing schooner Mettacomet wages alleged to be due to the libelant. The case was heard in open court.

One Manuel Simmons was the managing owner of the Mettacomet. In November, 1913, he let one McDonald take her, as master, for a bluefishing voyage in Southern waters on the one-fifth lay. This lay is the same as the more common one-quarter lay, except that the vessel takes only one-fifth of the gross catch, instead of one-quarter thereof. McDonald was to ship his own crew; the owners had nothing to do with that. The master and crew were to pay all running expenses of the vessel. McDonald shipped two or three men

---

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in Gloucester, and then brought the schooner to Boston, where he shipped the rest of the crew, including the libelant, who was shipped as cook. The agreement between him and the master was entirely oral, and was only that he should receive "as good a lay as any cook going out of the dock." This he claims amounted to a "share" in the catch and fixed wages of $1 a day in addition; and I so find. The arrangement is sometimes referred to as "a share and an extra." It is customary in the fishing business for cooks to be paid in that way; and this custom was known to Simmons. The amount of the "extra" varies with the size of the vessel and the length and character of the trip in contemplation. The ordinary "extra" for a vessel the size of the Mettacomet would not amount to more than $20 a month. The owners had no knowledge of the terms on which the master engaged the cook, and no authority to interfere as to them.

The Mettacomet left Boston about November 13, 1913, and arrived back about May 5, 1914. She caught practically no fish during the voyage, not nearly enough to pay the operating expenses. McDonald drew on Simmons from time to time for advances of money in order to pay for food, gasoline, etc. Such trips, which are called "broken trips," or "brokers," while not uncommon, are by no means unknown in the fishing business.

[1] The claim of Holmes here in question is to recover from the vessel or her owners his wages of $1 per day, agreed upon between him and the master. On successful trips the cook's wages, or "extras," are paid as a bill from the part of the catch which belongs to the master and crew before the apportionment of their shares. It is clear that as between the vessel or her owners, on the one side, and the master and crew, on the other, the latter are bound to pay the wages here claimed; indeed, this is not denied by the libelant. His contention is that the vessel or her owners are liable for his wages only when the catch is not enough to pay them.

It was decided by the Circuit Court of Appeals for this circuit in The Carrier Dove, 97 Fed. 111, 38 C. C. A. 73, that the shares of the crew were in effect wages, and were recoverable from the vessel when the master absconded with the proceeds of the catch. It is urged that the principle there established covers this case. The ground upon which that decision ultimately rests is that the vessel was responsible for the misconduct of the master, to whom she had been let by her owners. In this case there is no question of any misconduct; it turns, as it seems to me, upon the agreement between Holmes and the master. The libelant testified that on previous voyages, when there had been no catch, he had always been paid by the skipper; "if he wants to hold his cook, he must pay him." McDonald testified that Holmes—

"was supposed to get wages when we got our share. I expected he was to be paid from the catch, same as I was. None of the crew were to get anything unless fish were caught."

There was never any express agreement between the libelant and McDonald as to the payment of his "extra," if no catch should be made.

The libelant asserted that there was a custom for the owners of the vessel to pay the cook's wages, or "extra," on "broken trips." The evidence, however, certainly fails to establish any such custom. In a few instances, where the owners evidently desired to retain the services of the cook for succeeding trips with the vessel, they have paid his money wages. In other cases, where the master desired to secure the services of the cook for succeeding trips with him, he paid the cook's money wages out of his own pocket. Where the crew remains the same on succeeding trips as on the "broken trip," advances made by the owners for supplies on the "broken trip" are sometimes deducted from the share of the catch coming to the crew on the succeeding trips. See comment by Lowell, J., The Carrier Dove (D. C.) 93 Fed. 979. There is no custom decisive of the question at issue, or well enough recognized to be read into the agreement between Holmes and McDonald under which Holmes shipped. It seems to me the cook's "extra" is in effect a preferred share, to be paid out of the catch; that Holmes' wages, both share and extra, were, like those of the rest of the crew, contingent upon a catch being made, and that he shipped upon that understanding and agreement; and I accordingly so find. It follows that he is not entitled to recover from the vessel, and that the libel must be dismissed. This disposes of the principal case.

[2] In the claim and answer of the owners, they assert a bill against Holmes for his pro rata share, with the master and with the rest of the crew, of the advances made by the managing owner at the request of the master for food and supplies during the trip. The claimant's contention is that the master and crew, including Holmes, were partners and joint charterers of the Mettacomet for the trip in question. This contention is not, I think, borne out by the facts. The arrangements for the charter of the vessel were made between the managing owner and McDonald. The crew had not yet been engaged, and had nothing to do with them. In this respect the facts are very similar to those of The Carrier Dove, ubi supra, in which it was held that the crew were not charterers, nor partners with the master, but "were hired fishermen, whose wages were dependent on the success of the fishing in which they engaged." Webb, J., 97 Fed. 112, 38 C. C. A. 73.

It follows that the claimants are not entitled to repayment from Holmes of any part of the sums advanced to the master.