W. M. WEBB, INC., Carteret, Inc. and
C. B. Dey, Inc., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

LOUISIANA BUNKERS, INC., Plaque-
mines Bunkers, Inc. and Charles
S. Wallace, III, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

SANTOS MENHADEN CORP., Citation,
Inc., and Novelty, Inc., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

PATTERSON MENHADEN, INC. and
Aggie & Millie, Inc., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

G. B. L., INC., Merlin Inc., Frances Louise
and Patricia Ann Webb, t/a Webb-
Bunker Co., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 15170–15172, 15215
and 15216.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 13, 1967.

Joseph J. Lyman, Washington, D. C.,
David E. Hogan, New Orleans, La., for
plaintiffs.

Robert L. Waters, Atty., Tax Div.
Fort Worth, Tex., Edward A. Copley,
Atty., Dept. of Justice, Washington, D.

C., Louis C. LaCour, U. S. Atty., New Orleans, La., for defendant.

CASSIBRY, District Judge:

These five causes involving similar issues of law and fact were consolidated for trial before the Court sitting without a jury.

These are actions under the Internal Revenue laws of the United States for the recovery of taxes paid pursuant to the Federal Insurance Contributions Act, 26 U.S.C.A. § 3101 et seq., and the Federal Unemployment Tax Act, 26 U.S.C.A. § 3301 et seq., for the period commencing January 1, 1956 through December 31, 1956, for all plaintiffs with the exception of the plaintiff Aggie & Millie, Inc., in Civil Action No. 15215. The suit for taxes paid in the latter suit covered the period from July 1, 1957 through December 1, 1958.

The issue to be determined is whether the fishermen, comprised of captains and crewmen, who performed fishing services on the plaintiffs' boats were "employees" of the plaintiffs under Sections 3121(d) and 3306(i), Internal Revenue Code; 26 U.S.C.A. § 3121(d) and § 3306(i).

Only that portion of Federal Insurance Contributions Act taxes (FICA), an excise tax, paid by the plaintiffs is sought to be refunded. No part of the fishermen's FICA taxes, an income tax, is sought in these actions. The Federal Unemployment Act taxes (FUTA), which are excise taxes, paid solely by the plaintiffs are also sought to be refunded.

Due consideration having been given to the pleadings, stipulations and evidence, together with exhibits and briefs of counsel on file, the Court enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure:

FINDINGS OF FACT

1.

Each of the plaintiffs was a corporation, organized under the laws of the State of Louisiana, with the exception of the plaintiff partnership, Frances Louise Webb and Patricia Ann Webb, t/a Webb-Bunker Company in Civil Action No. 15216.

2.

In Civil Action No. 15170, the plaintiff W. M. Webb, Inc. owned two menhaden boats. The plaintiff Carteret, Inc. owned one menhaden boat; Plaintiff C. P. Dey, Inc. owned one boat.

3.

In Civil Action No. 15171, the plaintiff Louisiana Bunkers, Inc. owned two menhaden boats. Plaintiffs Plaquemines Bunkers, Inc. and Charles S. Wallace III, Inc., each owned one menhaden boat.

4.

In Civil Action No. 15172, plaintiff Santos Menhaden Corp. owned five menhaden boats. Plaintiff Citation, Inc. owned two boats and plaintiff Novelty, Inc. owned one boat.

5.

In Civil Action No. 15215, plaintiff Patterson Menhaden Corporation owned two menhaden boats and plaintiff Aggie & Millie, Inc. owned one boat.

6.

In Civil Action No. 15216, plaintiff G. B. L., Inc. owned two boats. The plaintiff Merlin, Inc., owned one boat. The partnership, Frances Louise Webb and Patricia Ann Webb, t/a Webb-Bunkers Co., owned one boat.

7.

During said period, each plaintiff was engaged in commercially fishing for menhaden, a non-edible fish. Their business activities embraced (a) the ownership of menhaden fishing boats, (b) the fishing for menhaden under arrangements with captains on the terms and conditions and pursuant to policies outlined in these Findings of Fact, and (c) the processing of menhaden into fish meal products for later sale on the open market.

**8.**

There were several separate and distinct steps in the fishing and subsequent processing of the fish before the end products were marketed. First, the plaintiff boat companies contracted with the captains to gather the fish. To this end, a plaintiff furnished a boat equipped for fishing. The owner relinquished control of the boat to the captain who staffed and provisioned it as he saw fit, without interference by the owner. In return, the captain agreed without a guarantee of earnings of any kind to make fishing trips for the season, return the catches to a plant designated by the owner and unload and sell his fish to the owner at an agreed price per catch. The owner would then contract with a processing plant for processing the fish purchased from the captain. The fish would be processed into fish meal and related products and sold on the open market. The proceeds were then divided between the boat owner and the plant after crediting the venture with expenses and the cost of the fish. The captains had no part in the arrangements between the plant and the boat owner. All of the plaintiffs conducted their business in substantially the same manner.

**9.**

The plaintiffs' boats were diesel powered and from 85 feet to 150 feet in length. The cost of the boats varied from $24,000 to about $157,000 depending upon age and size.

**10.**

The plaintiffs' boats operated from docking facilities owned by fish meal processing plants, located in North Carolina and Florida on the eastern seaboard and in Louisiana on the Gulf of Mexico. During this period, the plaintiffs' boats operated from one or more processing plants located in the following ports: Wallace Fisheries Company, Morehead City, North Carolina; Mayport Fisheries Company, Fernandina Beach, Florida; Empire Menhaden Company, Empire, Louisiana; and Louisiana Menhaden Company at Cameron, Louisiana.

**11.**

Neither the plaintiff boat companies nor the fish meal processing plants had financial or proprietary interests in one another. Individual stockholders of some plaintiff boat companies had a stockholder's interest in some of the plant companies, but not in others. On the other hand, some stockholders of the plant companies had no interest in the various plaintiff boat companies. All of the various entities, i. e., plaintiff boat companies and the plant companies, were separate and distinct operations with respect to business matters transacted among them. The individual stockholder interests in no way determined from which plants the various plaintiffs operated the boats or sold their catches of fish.

**12.**

The plaintiffs' boats were equipped by them and operated solely for menhaden fishing. All repairs to the boats were made by, and paid for by, the plaintiffs. After the plaintiffs had equipped a boat for fishing for menhaden, from the fishermen in the community making application therefore, plaintiffs would select an experienced fisherman to whom a boat would be turned over for the purpose of fishing in the Gulf of Mexico or off the Carolina and Florida coasts in the Atlantic Ocean. It was understood that the fisherman to whom a boat was let would be its captain and he was so recognized by the plaintiffs. An individual so selected was one in whose honesty and integrity plaintiffs had confidence and in whom plaintiffs had trust in his ability to select, supervise and organize a crew of officers and hands to operate a boat and to conduct successful fishing operations.

**13.**

The arrangement between the plaintiffs and each captain was entirely oral. The term of the arrangement was not specified, but it was understood to persist for a fishing season. It could be terminated by either party, voluntarily or involuntarily, at the conclusion of any

trip during a season. This could occur only when a boat was in port and before another fishing trip was commenced. While the arrangement could be so terminated, custom and practice was for it to be continued for the season.

### 14.

After a plaintiff had selected a captain and the arrangements between them had been concluded, the boat was turned over to the captain who then registered as captain of such boat with the Bureau of Customs as required by federal law.

### 15.

While not formalized by the parties and designated as such, the arrangement between plaintiffs and the captains thus constituted an oral contract, pursuant to which the captains used the boats belonging to the plaintiffs to go out to fishing grounds, and by their own means and methods make catches of menhaden fish and return them to a designated processing plant for unloading and sale to the plaintiffs at an agreed price per unit of measurement. The plaintiff boat owners' interest in the arrangement was to obtain the largest quantity of fish possible, delivered to a designated processing plant. The plaintiffs in no way interfered with the captains as to the manner or method of accomplishing their result.

### 16.

The fishing "season" in the menhaden fishing industry usually began in the Gulf of Mexico about April 1 and concluded about October 15. A fall season off the eastern coast of the Carolinas and Florida commenced about November 1 and concluded around January 15. There was also a summer fishing season at times on the Atlantic coast which usually began about May 15 and concluded about September 1.

### 17.

The general area for fishing a boat, i. e., the Gulf of Mexico or Atlantic Ocean, was usually the plaintiffs' decision. This was guided by the seasonal presence and availability of the menhaden

fish. If a boat owner had an option of two places to fish, the captain's preference where to fish was a factor in a joint decision.

### 18.

Some captains fished only in the Gulf area by their own choice. Others fished only off the Carolina coast in the Atlantic Ocean. Some fished in both areas for consecutive seasons in a single year. Others fished a single season for plaintiffs and at other times for competitors. Some captains fished consecutive seasons on some of plaintiffs' boats. Other captains contracted seasonally with various of the plaintiffs for use of their boats over a period of years. There was no pattern of continuity of relationship between particular captains and particular plaintiffs.

### 19.

There was nothing in the arrangements between plaintiffs and the captains which required plaintiffs to assure or guarantee any captain the use of a particular boat, or in fact any boat, beyond a single fishing season. Nor were captains bound to accept a boat offered by a particular plaintiff once a season ended. Thus, each season was the subject of new and separate negotiations between plaintiffs and the captains. Although a captain may have completed a season in the Gulf of Mexico and left the boat to take another, or sailed the same boat to the Carolina coast to fish the fall season, a new arrangement was made each season with the particular boat owner.

### 20.

The commencement and termination of a season was a separate and complete arrangement and was so considered by the plaintiffs and captains. All arrangements between them were understood to be on a season-to-season basis. A new and complete set of personnel and financial records were instituted for each boat for each new season and maintained by the processing plant from which the boat operated during the season. The opening

of the processing plants determined the commencement date of a particular season. When the season commencement date is fixed, the taxpayers furnish their captains and crews, many of whom are required to travel from North Carolina to Louisiana, with transportation money.

21.

The plaintiffs during this period determined that a crew of 24 men was the number necessary for successful fishing. Each captain, however, determined the qualifications of, and selected, his crew which in this period consisted of a mate, engineer, pilot, cook and about 20 net handlers. The captain could in his discretion hire additional mates or engineers or net handlers, but seldom did because the additional cost would be deducted from his share of the catch. He also had the right to sail with less than 24 crewmen, but did not without consulting with the plaintiff.

22.

In negotiating for the service of a captain, it was understood that the captain would select the crew members. Prior to commencement of a new season, the taxpayers would furnish the captain with the pay scale of crew members and the crew size to be employed for the season. If a bonus was to be paid for fishing the entire season, this information also was furnished the captains.

23.

Although the taxpayers did furnish a pay scale and a statement regarding crew size to the captains, there was some flexibility left with the captains on these matters. If the captain desired to raise the pay of a particular crew member, he could do so by reducing his own level of compensation.

24.

Defendant contended and the plaintiff denied that the captain was required to pay a crew member not less than the scale established by the plaintiff. The testimony of the various captains leave no doubt that the plaintiff not only fixed the pay scale of the crew but also the number of crewmen to be hired.

25.

Each captain, to the exclusion of the plaintiffs, had full charge of his crew and determined (a) when to depart from port on a fishing trip; (b) when to return; (c) where to fish (that is, the fishing grounds to work); (d) when to fish; (e) how to fish (that is, the actual, mechanical process of putting out the nets, purse boats and other gear); and of all other matters concerning the operation, maintenance and fishing of the boat from the time of departure until it returned to unload the catch. All of the foregoing were the exclusive prerogatives of the captain. The crew took their orders from the captain exclusively.

26.

Plaintiffs had certain general policies made known to the captains which were a part of the arrangements between plaintiffs and each captain; for example, intoxicating liquors were not to be taken aboard the boats, and to refrain from fishing in areas restricted by law to avoid fines and other penalties imposed by the State.

27.

Plaintiffs had no right to, nor did they attempt to instruct a captain or crew as to their actual fishing activity, nor how to accomplish it.

28.

The captain was responsible for keeping the boat clean, the engines in working order and while the boat was in port to keep it properly moored, watched and pumped out. The captain received no additional pay for this work, other than the proceeds from the sale of his fish catches to the plaintiff boat owner.

29.

At the outset of each season, the plaintiffs and the captains who used their particular boats negotiated a price at which plaintiffs would purchase and the captains would sell their catches of fish, to be delivered and unloaded at a designated fish meal plant.

**30.**

Payment was made by the boat owners to the captains at an agreed rate per unit, i. e., each 1000-fish caught and delivered. The unit of measurement, a "1000-fish," was the volumetric content of an unloading device at the plant where the fish were unloaded. The measure of 1000-fish weighed 660 pounds.

**31.**

There was no guarantee of compensation of any kind regardless of time or effort expended by the captain and crew. Unless a captain caught fish to sell to plaintiffs he had no earnings.

**32.**

The price paid by the plaintiffs per 1000-fish differed with the seasons and among plaintiffs in their separate negotiations with captains. However, the price usually remained constant during a particular season, irrespective of fluctuations in the marketability of the fish products processed.

**33.**

In addition to the price paid per 1000-fish unit, plaintiffs agreed to pay a captain an additional amount per unit as a "bonus." The bonus, small in relation to the price per unit of fish paid the captain, was in addition to the purchase price agreed upon. It was payable only at the conclusion of a fishing season. The amount seasonally varied among the various plaintiffs and captains in accordance with the number of units of fish caught during the entire season. The bonus money thus paid the captains was distributed at the conclusion of a season among the crew in such amounts as the crewmen and captain negotiated, based on the number of units of fish the crewmen helped to catch. The plaintiffs had no right to interfere in the negotiations between captains and crewmen. The bonus served two purposes: First, it stood as a reward or an incentive for the crew to exert greater efforts to increase the size of fish catches, and second, it aided the captain to induce the crew members to remain with the vessel to the end of the season in order to realize the additional money.

**34.**

The plaintiffs did not know who the crew members would be at the time plaintiffs and the captain entered into their arrangements. Plaintiffs had no written record of the crewmen's identity until they filled out forms listing them on plaintiffs' records for state and federal tax requirements, or until the captain filed his first bi-weekly payroll record with the particular plant. Personnel turnover in crews varied among the boats. Factors determining turnover and relative stability among the crews depended largely upon the captain's ability as a fisherman. The plaintiffs reserved no right to interfere in these matters, nor attempted to do so.

**35.**

The captain decided how much fuel and groceries to take aboard. The fuel was usually obtained at fuel docks near the plant from which the boat operated or anywhere a captain decided. Fuel consumed was paid for by the plaintiffs. The captain had the right to purchase his groceries at a store of his own selection and either paid cash for them or charged them in the name of the boat and a bill therefor would be sent to the plaintiffs. At the time of settlement the amount charged against the boat and paid for by the plaintiffs for the groceries was deducted from the price paid to the captain for the latter's catch of fish. In addition to their groceries, the crew provided their own personal gear, such as foul weather clothes, boots and other wearing apparel, etc., which was in keeping with a long-standing custom in the fishing industry.

**36.**

After each trip the fish were unloaded at a plant in the presence of the captain or his delegate. The plant operator furnished the captain with a tally-sheet, showing the number of units (per 1000-fish) caught by the captain. From this information the captain would ascer-

tain the amount he would receive from plaintiffs for his catch.

### 37.

The captain kept a daily payroll record of the amount to be paid to each crewman out of the proceeds paid the captain for a particular catch of fish. This daily record reflected who comprised the crew for each catch, the rate paid to each member of the crew, together with rate variations (if any) for the same man and the number of units (per 1000-fish) of his participation in the catch. There was deducted from each crew member's share his portion of the cost of groceries and personal gear charged against the boat, together with any advances of money made against earnings. This payroll information was turned over bi-weekly by the captain to the processing plant. The plant's office compiled the captain's payroll data into a single payroll sheet showing the total amounts to be paid to the captain and each crewman bi-weekly. Checks were issued by plaintiffs to the captain and each crewman in such amounts as the captain, the plaintiff and each crew member had agreed upon. The checks were delivered to the captains who, in turn, distributed them among their crews. If the amount distributed by the captain among his crew exceeded the amount the captain received from the plaintiff for the sale of his catch, the plaintiff paid no additional amount; the excess was paid by the captain out of his own pocket.

### 38.

Each time and at the time a boat returned to port for unloading at a plant, the trip was over and the work of fishing on that trip was concluded. The captain was then in possession of the catch, which was owned by him and which he had agreed to sell to the plaintiffs at an agreed price per unit of 1000-fish.

### 39.

During this period, the boats were not refrigerated. Fishing trips, therefore, usually lasted a single day. The fishing was done in the vicinity of a fish processing plant so that the day's catch could be unloaded readily to avoid spoilage of the fish. This situation pertained in the Gulf of Mexico area particularly where the weather was warm. Occasionally fishing trips off the Carolina coast in the fall and winter season lasted several days where a day's catch was small and the weather was cold enough in the captain's judgment to preserve the quality of the fish already caught. The boat would then continue fishing until it could return with a large cargo of fish for unloading and sale. Menhaden being very perishable, it was to the interest of the captains and plaintiffs therefore, to unload and make immediate disposition of the catch upon reaching port.

### 40.

The captain would prepare for another trip as soon as practicable after unloading. It was to the interest of the parties, as well as the processing plants, to keep the boats fishing as often as practicable. But a boat would remain in port if, in the captain's judgment, it was unseaworthy and needed repairs or new nets, or if he believed weather conditions were unsuitable for fishing. These matters were left to the captain's discretion.

### 41.

The livelihood of a captain depended solely upon his initiative and skill as a fisherman, coupled with the probables of weather and the run of the menhaden. He may have exerted his efforts for long or short periods of time and have no claim to earnings or compensation of any kind, while, on the other hand, he may have been well rewarded by large catches made in a short space of time. While plaintiffs did not pay a captain a salary and did not guarantee any captain a profit from his fishing, plaintiffs did guarantee each captain a market for his catch (if there was one) at a price agreed upon at the beginning of the fishing season. Thus each captain was assured that all his

catches brought to a plant designated by plaintiffs would not be lost by spoilage.

### 42.

If a particular trip in the season was unsuccessful, known in the trade as a "broker," and the value of the catch was insufficient to cover the captain's portion of the expenses of a trip, the captain's portion of the expenses would be carried over to succeeding trips to be deducted from the price of the fish paid the captain for subsequent catches. The unpaid expenses were regarded as a personal obligation of the captain. However, if the captain's portion of expenses for groceries charged to the boat was unpaid at the close of a season, the plaintiffs usually paid it. But if bonus money was due the captain, it was sometimes used to pay any outstanding grocery bill.

### 43.

A captain could and often did obtain advances of money from plaintiffs. The advances were repaid out of the proceeds from the future sale of catches to the plaintiffs. Advances to crewmen by the plaintiffs were made only with the express permission of the captain who was personally charged with their repayment. The captain in turn would charge the amount against the crewman's share which had been agreed upon between him, the captain, and set by the plaintiff.

### 44.

There was no express agreement specifying the extent to which plaintiffs had control over the fishing activities of the captains. It was clear that no actual control was exercised over the details, manner or methods employed by the captains and their crews.

### 45.

The plaintiffs' boats were equipped with radios through which the captains maintained contact with each other while fishing to aid in finding the schools of menhaden fish. The plaintiffs did not interfere in the captain's use of the communications facilities. The processing plants furnished airplanes and pilots to the venture as spotters and observers to assist the captains in locating schools of fish. Radio communications between the planes and plaintiffs' boats were maintained for this purpose. The captains had the right to accept or reject this service and to exercise their own judgment as it best served their interests. No charge for the plane spotter service was made to the plaintiffs by the plants.

### 46.

The plaintiffs did have the right to control the results of a captain's work and interfered in the process to some degree to assure a proper result from the undertaking.

### 47.

Ordinarily a captain completed a fishing season before leaving the boat for any reason. There was no evidence of termination of any relationship or contract during a season. But if fish were scarce and the captain could not keep his crew, a captain would have terminated the arrangement before the season was over. Termination may also result during a season by reason of the captain's ill health. A plaintiff may have terminated relations and declined to give a boat to a captain who had been unable to produce adequate catches of fish during a prior season. Captains had the right to, and did, contract with plaintiffs' competitors or with plaintiff boat owners other than those whose boats they fished for a prior season.

### 48.

The plaintiffs had no agreement with the captains which entitled them to a preferred call on all the time and services of the captains.

### 49.

The plaintiffs had no actual control over the crewmen, nor did they exercise any control over the latters' activities through the captains.

### 50.

The plaintiffs filed proper employment tax returns with the Internal Revenue

Service during the period here in issue and paid employment taxes on the earnings of the captains and crewmen.

### 51.

The plaintiffs filed timely claims for refund of their portion of the Federal Insurance Contributions Act taxes and Unemployment Act taxes paid on the earnings of the captains and crewmen. The claims were never acted upon by the Internal Revenue Service. These suits which followed were timely filed.

## CONCLUSIONS OF LAW

### 1.

This Court has jurisdiction of the parties and these actions pursuant to the provisions of Title 28, Section 1340 and Section 1346(a), United States Code.

### 2.

The provisions of Sections 3121(d) and 3306(i), Internal Revenue Code [26 U.S.C. §§ 3121(d) and 3306(i)] provide that the common-law rules are applicable in determining who are employees under the Federal Insurance Contributions Act and Federal Unemployment Tax Act.[1]

### 3.

■ The defendant's contention that the common-law governing the relationship of the taxpayer and the fishermen in pursuing fishing ventures in the Gulf

of Mexico and the Atlantic Ocean is the general maritime law is without merit.

### 4.

■ In determining whether, under the common-law test, an individual is an employee for tax purposes, the decisions of the federal courts, rather than those of the various states, are controlling.[2]

### 5.

■ The facts in this case are not on all fours with those in the *Crawford* suit (Note 1). The basic difference is that here the plaintiff set the pay scale of the crewmen and fixed the number of crewmen that the captain could hire. All the other facts are essentially the same. Treasury Regulations on Employment Tax (1954 Code), relating to the Federal Insurance Contribution Act, Section 31.-3121(d)–1(c) sets forth rather accurately the common-law tests which should be applied in determining whether the relationship of employer and employee exists.[3] Applying the facts of this case to these tests, I conclude that the degree of control exercised by the plaintiff in marketing the fish was not such as to create the relationship of employer-employee. Since the Court in *Crawford* concluded that the facts there did not constitute sufficient control to establish the taxable relationship, then the added

---

1. United States v. Crawford Packing Company, 330 F.2d 194 (1964).

2. Loeb v. United States, 209 F.Supp. 22 (E.D.La.1962); Williams Packing & Nav. Co. v. Enochs, 176 F.Supp. 168, D.C., affirmed 291 F.2d 402 (CA–5, 1961); Crossett Lumber Co. v. United States, 79 F.Supp. 20 (W.D.Ark.1948).

3. "(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules."

facts here would not be sufficient to support a contrary result.[4]

### 6.

Plaintiffs severally are entitled to a refund of the Federal Insurance Contributions Act taxes and Federal Unemployment Act taxes claimed by reason of erroneous payments and unlawful collections thereof in amounts to be computed by the parties, together with interest and costs as may be allowed by law. If the amounts are not agreed upon, the same shall be settled on five days notice.

### 7.

Judgments will be entered for each of the several plaintiffs.

---

4. United States v. Crawford Packing Co., supra; Williams Packing & Nav. Co. v. Enochs, supra; Star Fish & Oyster Co. v. United States, 223 F.Supp. 402.