**T. L. BISHOP et al.**

**v.**

**UNITED STATES of America.**

**Joe MAGEE et al.**

**v.**

**UNITED STATES of America.**

**Nathan BOUDOIN et al.**

**v.**

**UNITED STATES of America.**

**GULF TRAWLERS, INC., Sidney E. Herndon, d/b/a Herndon Marine Products Co.**

**v.**

**UNITED STATES of America.**

**JOHNSON & JOHNSON PROCESSORS, INC.**

**v.**

**UNITED STATES of America.**

Civ. A. Nos. 68–C–82, 70–C–95, 70–C–96, 69–C–180, 70–C–49.

United States District Court,
S. D. Texas,
Corpus Christi Division.

May 31, 1971.

Joseph J. Lyman, Washington, D. C., and Eli Mayfield, Palacios, Tex., for T. L. Bishop, and others.

George Pain, Asst. U. S. Atty., Houston, Tex., and Charles Merkel, Tax Division, Dept. of Justice, Washington, D. C., Wm. L. Bowers, Asst. U. S. Atty., Houston, Tex., for the United States.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

The Plaintiffs in the several actions above designated and which, although not consolidated, were tried before the Court at the same time, seek to have refunded taxes paid by them pursuant to the Federal Insurance Contributions Act, 26 U.S.C.A. § 3101 et seq., for the period January 1, 1965, through December 31, 1966. Each Plaintiff, whether an individual, partnership or corporation, is doing business in Texas within the jurisdiction of this Court. This Court has jurisdiction of the parties and this action pursuant to the provisions of 28 U. S.C., § 1340. Venue is proper under 28 U.S.C., § 1402.

The facts as to each Plaintiff are, for all practical purposes, the same, and briefly stated show that each Plaintiff is the owner of a boat used primarily for shrimp fishing; that by oral agreement each Plaintiff (also called "Owner") in effect rents his boat to a captain, who, in turn, furnishes the crew, which consists of one or two fishermen in addition to the captain. The financial arrangements range from 35% to 50% of the catch to the captain and his crew, and the balance to the owner. This arrangement is sometimes referred to as fishing on shares or the lay plan, but no partnership is created. The captain of each boat is in complete control from the time it leaves the dock until it returns. He carries with him no list of "does and don'ts" and he is not required to report to the owner until he turns the boat back to him. The captain purchases the food, fuel and ice which is paid for out of the crew's share. The owner insures and repairs damage to his boat and, in each case, has some say (for reasons other than owner's profit) where the shrimp are delivered if the boat returns to its home port, but where the shrimp is to be delivered in another port is up to the captain. Detailed findings are attached as an appendix hereto.

In determining whether the captains and crewmen who worked on the boats of the plaintiffs, under circumstances above described, were employees of the plaintiffs within the meaning of 26 U.S. C., §§ 3121(d) and 3306(i), it is necessary to judge their status against the standards of the maritime law. United States v. W. M. Webb, 397 U.S. 179, 191 and 194, 90 S.Ct. 850, 25 L.Ed.2d 207 (1969).

██ ██ Under general maritime law, the existence of a demise negates an employer-employee relationship between the vessel owner and the crew and says rather that the owner *pro haec vice* is the employer of the crew. Whether or not a demise exists depends on the factual basis of the relationship, and there is convincing authority that fishing on the lay as above outlined creates a demise charter, thereby making the captain of the vessel the owner *pro haec vice* and the employer of the fishermen.

In Thorp v. Hammond, 79 U.S. (12 Wall) 408, 20 L.Ed. 419 (1870), the general owners of a vessel were held not to be liable for damages resulting from a collision between that vessel and another where one of the co-owners had become the charterer of the vessel, exclusively commanding, sailing and managing it, under arrangements made with the other owners. The Supreme Court pointed out, on page 416, that:

> "He sailed the vessel on shares, hiring his own crew, paying and victualling them, paying half the port charges, retaining half the net freight after the port charges were taken out, and paying to the general owners the other half. It is clear, therefore, that he must be considered as having been the owner *pro haec vice*."

In The Carrier Dove, 97 F. 111 (1 Cir., 1899), the master chartered a fishing vessel on the "quarter clear lay" of the catch. In answer to a suit by the fisherman to establish a lien against the owners for wages, the First Circuit clearly indicated that a "fishing on the lay" agreement created a demise between the owner and the captain with the upshot that the crew were employees of and must look to the captain and not the owner. See also The Mettacomet, 230 F. 308 (D. Mass., 1915), aff'd 233 F. 261 (1 Cir., 1916).

The First Circuit continued to adhere to the reasoning of The Carrier Dove in Cromwell v. Slaney, 65 F.2d 940 (1 Cir., 1933), wherein the plaintiff, wife of a deceased seaman, sought recovery from the owner, as employer of a fishing vessel, on grounds of negligence and unseaworthiness. In denying the existence of an employee-employer relationship between the deceased seaman and the owner, the First Circuit stated, at page 941:

> "The operation of fishing vessels under agreements, or lays, so-called, for sharing the proceeds of the catch, has been familiar to those engaged in the business and to the courts for more than a century; and it has been held by the courts that, under a 'fishing lay,' where the captain employs the members of the crew and controls all the operations of the vessel, both in purchasing supplies for the voyage, in determining where he will fish, how long, and in disposing of the catch and settling all the bills, he becomes the owner *pro haec vice*, and that the crew is in the employ of the master and not of the owner."

The Ninth Circuit has recognized the reasoning of the First as valid, but did not follow it in *The Norland*, 101 F.2d 967, 9 Alaska 471 (9 Cir., 1939), involving a Jones Act claim, because the facts did not support it. The Court held that one of the owners went on the voyage to supervise the captain, and, " * * * that the crew was controlled as to where the fishing was to be done, the labor to be performed, and even as to the manner of the performance of their labor * * *." In light of these facts, the Court then spoke of the facts involved in The Carrier Dove, Cromwell and Thorp, supra, as showing "clearly that the general owners had surrendered entire control, direction and management of the vessel to the master, * * *." *The Norland* points out that the issue of the existence

of a demise is one of fact, and, by implication, that the trier of fact can, under the authority of *The Carrier Dove*, *Cromwell* and *Thorp*, supra, find upon facts as in the instant case a demise, with the result that seamen are employees of the captain.

■■ The courts have deviated from the general maritime law in personal injury and wrongful death cases by requiring, for humanitarian reasons, that fishermen, being wards of the sea, not be precluded *ipso facto* from recovery simply by the construction of an implied demise. The Court does not believe that cases which create an enlarged standard for humanitarian purposes should be considered as changing the general maritime law or the maritime common law. The common law is generally described as those principles, usage and rules of action applicable to the government and security of persons and property which do not rest for their authority upon any express and positive declaration of the will of the legislature. The deviation as to personal injury and wrongful death cases has come about by virtue of the courts' attempt to construe the congressional intent in Jones Act cases. Now, the Court will consider the cases cited by Defendant, and explain why such cases are no authority for denying the existence of a demise on the facts of this case.

In Hudgins v. Gregory, 219 F.2d 255 (4 Cir., 1955), fishing on shares was held merely not *ipso facto* to create a demise between the master of the vessel and the owner for the purpose of determining an employer-employee relationship upon which to predicate an action under the Jones Act for personal injuries by a seaman. The payment of Social Security and unemployment compensation taxes was used as a part of the basis for determining the plaintiff to be an employee of the owners, not the other way around. Such method of reasoning cannot justify a claim of authority.

The Defendant also cited Peters v. Rohrman, 272 F. 338, at page 339 (D.N. J., 1921), which case stated:

"A master operating a vessel on shares is not *ipso facto* an owner *pro haec vice*, but, as is conceded by the counsel for the libelant, an express agreement must be shown, or circumstances from which such agreement can be inferred, by which the possession and control of the vessel was surrendered to the master."

There the Court found a demise based upon circumstances similar to the instant case and that as a result of that demise, the owners could not be held liable for the charterers' breach of a contract of affreightment.

In Justillian v. Versaggi, 169 F.Supp. 71 (S.D.Tex., 1954) (Allred, J.), the Court held that the captain of a shrimp boat was not the owner *pro haec vice* and therefore not the employer of a seaman who sought recovery from the owner of the vessel under the Jones Act. While we are aware that there is some similarity of the facts here to those in the instant case, the Judge who heard the testimony and observed the witnesses, concluded, on page 72, "Respondent prescribed rigid safety rules and required the Captain to report when any equipment was out of order. His own testimony, quoted in respondent's brief, shows a rather firm and rigid control of the vessel by respondent."

Here also, the Court used the deducting of withholding and Social Security taxes as one of the bases for determining the employer-employee relationship. In the instant case, the Court must reach the conclusion that the owner is the employer first, before considering whether or not such taxes are owed.

Other seamen's personal injury cases cited by the Defendant are even less in point than *Justillian*, supra, and merit no analysis. Moreover, even though this Court would probably be bound to follow *Justillian* should a similar Jones Act case arise here in the Southern District of Texas, it should be noted that on similar facts, even involving seamen's personal injury, at least one other court has gone the other way and found a demise between the owner and the captain of a

vessel fishing on shares. Solet v. M/V Capt. H. V. Dufrene, 303 F.Supp. 980 (E.D.La., 1969).

The Defendant attempts to buttress its position by citing Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962), for the authority that courts should be reluctant to find a demise charter when the dealings between the parties are consistent with any lesser relationship. This is a reading of dictum in *Guzman* totally out of context from the instant case. There the issue was whether an injured longshoreman could recover from the owner of the vessel for unseaworthiness, which had arisen during that time the owner contended the vessel was demised to the longshoreman's employer. Clearly, the humanitarian policies concerning whether to favor a demise were far afield in *Guzman* from those in the instant case. Furthermore, close scrutiny of the cases upon which this dictum of *Guzman* was founded tends to strengthen the proposition that within a commercial context, as opposed to a personal injury context, a court may readily imply the existence of a demise under appropriate circumstances. For example, in Reed v. United States, 78 U.S. (11 Wall) 591, 20 L.Ed. 220 (1870), the general owner retained possession, command, and navigation of the ship, *hired the crew*, and contracted to carry cargo for a *specified voyage*. In the instant case, there was no specified voyage and the owner clearly did not hire the crew. See also Leary v. United States, 81 U.S. (14 Wall) 607, 20 L.Ed. 756 (1871), in which the owner supplied the crew and retained possession of the vessel. Also cited by *Guzman* was United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1893), wherein a demise was found to exist because the vessel was under the exclusive management and control of the government charterer. Whatever presumption against finding a demise, as argued by Defendant, did not appear to be in operation in *Shea*, even though, " * * * the question (of a demise) * * * (was)

not free from doubt * * *." 152 U.S. 191, 14 S.Ct. 523.

By dictum, the Fifth Circuit, in Osland v. Star Fish & Oyster Co., 107 F.2d 113 (5 Cir., 1939), addressed itself to the issue of whether fishing on shares may be considered a demise from the owner to the captain. There, a seaman was allowed to seek recovery under the Jones Act against the owner of a vessel fishing on the lay plan. The Court stated, on page 114:

"(The owner) was operating the Mary Carmen in connection with its business of selling fish at wholesale; it furnished the boat and supplied the crew and vessel with oil, gasoline, groceries, bait, and other necessaries for the voyage; it ordered her to sail for a designated place on the Gulf for the purpose of catching a load of fish; it ordered the master to bring said fish to the port of Mobile and to unload the same at its plant."

From a reading of this quote, it is apparent the owner exercised a great deal more control than any of the Plaintiffs now before this Court.

The Defendant has failed to indicate any authority that would preclude this Court from finding a demise here, although the government places considerable reliance on the *Webb* case, with its several opinions. The Fifth Circuit, by way of confirming dicta previously written, did, after the Supreme Court said the standards of maritime law must be observed, hold, without citation of authority, that, under the peculiar facts of the case, the seamen were employees of the boatowner. Even so, *Webb* does not bar the finding of a demise here, since that case did not expressly consider the authority this Court has cited for the proposition that a demise may exist on the facts this Court must consider. We recognize there may be some justification for the Fifth Circuit in *Webb* holding as it did, but, the facts there are dissimilar from these. For example, in *Webb* (271 F.Supp. 249 at 251, 253 and 254), the established facts

showed that the boatowners designated the general area for fishing operations, the number of crewmen to be hired, the minimum scale of wages to be paid the crewmen by the captain, the size of bonuses paid the crewmen at the end of a season, where the fish were to be sold, and also provided airplane spotters to aid the captains in locating schools of fish. On the other hand, the facts this Court must deal with show that the captains determined wages, bonuses, crew size, fishing locations, where to sell their catch, and fished without the aid of boat-owner-financed airplane spotters. Finally, a close reading of the various *Webb* opinions leaves considerable doubt with this Court that *Webb* was truly a lay or share arrangement under ancient maritime authority because of the extremely significant fact that the boatowners guaranteed for the entire season a fixed price per thousand pounds. Thus, in *Webb* the captains did not share the risks involved in fluctuating market prices as is done under the traditional share or lay agreement.

The Fifth Circuit, in 402 F.2d 956 at 960, moreover, impliedly approved of Cape Shore Fish Co. v. United States, 330 F.2d 961, 165 Ct.Cl. 630 (1964), which was the only tax case, as opposed to a personal injury case, that has directly considered the possibility of a demise under anything near the instant case. Although *Cape Shore Fish Co.* reached a contrary result than here, it also is readily distinguishable on the facts.

For example, in *Cape Shore Fish Co.*, the fishing venture was governed by a union contract. 330 F.2d at 962. Here, there was no union or other contractual agreement between the vessel owners and the crews. In *Cape Shore Fish Co.*, the captain was hired with the understanding of continuity of employment from trip to trip. Here, there was no term contemplated beyond each trip. In *Cape Shore Fish Co.*, the owner was understood to have authority to instruct the crew and did so. Here, beyond standing customs,

there were no instructions given the crews by the vessel owners.

In *Cape Shore Fish Co.*, the owner told the captain when to sail, when to return to port, when to paint the boat, when to report the size of the catch by telephone, when to dock the boat, how long to stay at sea, how long to work the crew at sea, how many days to rest the crew ashore, and how to distribute the catch among the crew. Here, these matters were solely within the prerogative of each captain. Also, in *Cape Shore Fish Co.*, the crew was guaranteed a minimum wage for each day at sea, by virtue of a union contract, should the trip be a failure or "broker." Here, there was no guarantee, either to the captains or their crews.

Finally, *Cape Shore Fish Co.* itself recognized that fishing on the lay could, under appropriate circumstances, create a demise (330 F.2d 967) and that whether, for tax purposes, fishermen are employees of the owner or are employees of the captain of the vessel depends, in turn, on the facts before the Court.

In conclusion, save for *Cape Shore Fish Co.*, supra the cases cited by the Defendant for the proposition that a demise should not be implied on the facts of this case are not persuasive because they belong to that group of cases in which the Courts, in order to follow an humanitarian policy set by Congress to provide injured seamen with the possibility of recovery from the vessel owner, rather than the sometimes less solvent charterer, deviated from the general maritime law. But other authority and the factual distinctions between this case and the *Cape Shore Fish Co.* persuade the Court to find that *on these facts* there exists between the various vessel owners and the captains a demise agreement by which the crew are employees of the respective captains-owners *pro haec vice*, rather than of the vessel owners.

■ Inherent in *Webb*, supra, and in the Defendant's brief here is the implication that the vessel owners, rather than the captains, would be more responsible sources upon whom the liability of col-

lecting these taxes for the benefit of these seamen should fall. Even assuming, arguendo, that to be so, this Court cannot deny the Plaintiffs here the ancient maritime precedent cited for the proposition that these lay agreements created demise charters. To hold these seamen to be employees of the owners *on these facts* in order to provide them supposedly a more responsible collection source will require a change in established maritime doctrine—a change this Court leaves to the Congress.

This Court is of the opinion Plaintiffs severally are entitled to a refund of the Federal Insurance Contributions Act taxes and the Federal Unemployment Act taxes claimed by reason of the erroneous payment and collection thereof, in amounts to be computed by the parties, together with interest and costs as may be allowed by law. If the amount is not agreed upon within twenty (20) days from the date of this order, the determination of amounts shall be referred to this Court. This memorandum and order shall constitute the Court's findings of fact and conclusions of law.

Plaintiffs will, in each case, prepare a proper order in their respective favors, which shall contain the specific amounts recoverable, and each such order shall constitute a final judgment in that case.

### APPENDIX

(The following detailed findings of fact were submitted to the Court by the Plaintiffs. The Court considers these findings to be accurate and adopts same. This Appendix is referred to on page 416 of the Court's opinion.)

1. This is an action under the Internal Revenue laws of the United States for recovery of taxes paid pursuant to the Federal Insurance Contributions Act, 26 U.S.C.A., §§ 3101 et seq., and the Federal Unemployment Tax Act, 26 U.S.C.A., §§ 3301 et seq. The plaintiffs seek to have refunded that portion of the Federal Insurance Contributions Act taxes and the Federal Unemployment Act taxes paid by the plaintiffs.

2. Each of the plaintiffs are individuals doing business in the State of Texas, within the jurisdiction of this Court and claim refunds of the taxes in suit for the period January 1, 1967 through December 31, 1968.

3. During the said period, each of the plaintiffs was engaged in the business of commercially fishing for shrimp. The activities of the plaintiffs' business embraced (a) the ownership of one or more shrimp trawlers, (b) the fishing for shrimp under arrangements with captains on the conditions and pursuant to policies outlined in these Findings of Fact, and (c) the sale of the shrimp in the open market.

4. The shrimp boats weighed in excess of ten net tons. These boats were specially equipped, owned and operated solely for shrimp fishing, although fish other than shrimp (such as snapper of flounder) were occasionally caught incidental to fishing for shrimp.

5. After each plaintiff had equipped his boats for fishing shrimp, each would select an experienced fisherman to whom the boats would be turned over for the purpose of fishing shrimp in the Gulf of Mexico. Any individual so selected was one in whose honesty and integrity plaintiff had confidence and in whom the plaintiff had confidence as to his ability (a) to select a crew (that is, deckhands), (b) to operate the boat, (c) to conduct fishing operations, and (d) to supervise and get along with the deckhands.

6. The arrangement between each plaintiff and captain was entirely oral. The term of the arrangement was not specified or limited. It could be terminated by either party, voluntarily or involuntarily, at the conclusion of any trip, although in practice this occurred only at times when a boat was in port. While the arrangement could be so terminated, custom and practice was for it to be continued over a series of trips for each boat. While not formalized by the parties and designated as such, the arrangement constituted an oral contract pursuant to which the captains used the boats belonging to plaintiffs pursuant to

the customs, terms, usages and policies outlined in these Findings of Fact.

7. After an individual was selected as captain, the arangement between plaintiffs and the captains concluded and the boat was turned over to them by plaintiffs, the captains would take the boat identification papers to the Bureau of Customs and would register with said Bureau as captain of the boat as required by Federal Law.

8. Each captain determined the qualifications of and selected his deckhands (that is, his crew, consisting usually of one or two besides himself), determined the hours and working conditions of the crew and separately agreed with each crewman how much he was to be paid. Each captain had full charge of his crew to the exclusion of the plaintiffs and determined (a) when to depart on a fishing trip, (b) when to return, (c) where to fish, (that is, which fishing ground to work), (d) when to fish, (e) how to fish, (that is, the actual, mechanical process of operating the fishing nets and gear), and (f) all other matters concerning the operation, maintenance and fishing of the boat from the time of departure from plaintiffs' dock until return of the boat from a particular trip. The foregoing were the exclusive prerogatives of the captains. The deckhands looked to the captains exclusively for directions respecting the fishing venture.

9. It was part of the arrangement and understanding that when the boats operated near Aransas Pass, Texas, the shrimp catch would be returned to that port and unloaded at the Aransas Shrimp Cooperative. There would be no advantage in marketing the catch elsewhere in Aransas Pass, since the price is uniform for all purchasers. If the fishing was conducted some distance from Aransas Pass, the captains would decide at which port the catch would be unloaded and to whom the catch would be sold. In each instance the unloading was done with the view to obtaining the highest possible price for the shrimp.

10. The captains paid the labor cost for net repairs. It was their function to keep the boat cleaned, oiled and greased while in port as well as while on trips. While in port, the latter responsibilities had to be discharged by the captains either with deckhands with whom they had an existing arrangement, or with other help provided by them. Neither the captains nor their helpers were paid for their work performed in port except as such payment came out of sharing in shrimp caught from the boat.

11. Under the arrangement between each plaintiff and their respective captains, the latter used, worked or fished the particular boat on the "lay" or share basis consistent with a long-standing custom in the fishing industry. During the period involved the sale proceeds for each catch were divided 40% to the captain and crew and 60% to the plaintiff. However, with respect to the plaintiff Jack Yardley, the proceeds were split 50% to each with respect to small boats fishing in the bays. According to custom, it was understood that when the catch was put aboard the boat, the captain was then in possession of the catch which was owned by him (including the crew) and the plaintiff in the agreed proportions.

12. Plaintiffs did not share in fish caught or objects dredged from the water incidental to shrimp fishing. All such fish (such, for example, as snapper or flounder) and objects went to the captains and crews.

13. Heading was a necessary step in processing the shrimp for packing and ultimate sale and could be done either by the captain before unloading the catch, or by others after unloading the catch; but, if done before unloading, it served two purposes beneficial to both parties, to wit:

(1) It would reduce the weight of the shrimp and thereby permit a larger catch to be brought in, and

(2) It would help prevent the shrimp from spoiling, thus permitting a longer trip and insuring a fresher product.

The captains were assisted in the heading by their deckhands, but it was optional with the captains as to whether or not the shrimp would be headed before sale. If the heading was done by others than the crew, the cost was charged against the gross sale price before the division was made between the plaintiffs and the fishermen.

14. Plaintiffs had no direct relationship with the deckhands or crew. The captains selected them, worked them and agreed separately with them as to their pay, the latter being on a sharing basis which they negotiated between them. Plaintiffs usually did not know who the deckhands would be at the time the arrangement was made with the captains to fish a boat and, in fact, the deckhands frequently changed from trip to trip. The plaintiffs learned the names of the deckhands for each particular trip at the time of settlement, in order to compute for the captains and deckhands their respective participation in the captains' share.

15. Various expenses were incurred in connection with each fishing trip. The crew paid for their own groceries and wearing apparel, which was in keeping with a long-standing custom in the fishing industry. All other trips expenses were paid by the plaintiffs. A processing cost for unloading and packing the shrimp was charged against the gross sale price before the division between the plaintiffs and the fishermen. All repairs and maintenance costs to maintain the vessel and equipment were the plaintiffs' obligation.

16. After each trip a settlement was made wherein the plaintiffs would provide the captains with a settlement sheet which indicated the gross amount of the proceeds from the sale of the shrimp whether sold to plaintiffs, or another. Any amounts charged by the crew for groceries, net repairs, and personal items were shown as a deduction from the crew's share. Any advances made to the captain or to crewmen with the captain's permission were also deducted at settlement. The settlement sheet further disclosed the division of the captain's share between him and the crew (that is, between the captain and his deckhands) in such amounts as they had agreed upon.

17. The captains decided how much fuel, ice and groceries to take aboard. The captains had the right to purchase their groceries at any store of their own selection including one of several where the plaintiffs had established credit. The captains decided what groceries to buy and purchased the groceries. They sometimes paid cash but usually would charge them to the captains or crews in the name of the boat and the bill therefor would be sent to the plaintiffs. At the time of settlement the amount charged against the boat and paid for by the plaintiffs for the groceries was deducted from the captain's share of the proceeds from the sale of the shrimp.

18. Each trip was considered a separate transaction for purposes of settlement. The payment to the crew for each trip depended entirely upon the proceeds of the catch. The length of any given trip depended on various factors, such as the capacity of the boat, the fuel and ice supply, the weather, and the general shrimping conditions.

19. There was no guarantee of any kind of compensation to the captain, regardless of the time or effort expended, for attempting to catch shrimp. He was paid only for marketable shrimp caught. If shrimp spoiled before unloading the loss was borne by the plaintiffs and the fishermen jointly. If a particular trip was unsuccessful, known in the shrimping trade as a broker, and the value of a captain's share of the catch was insufficient to cover the captain's portion of the expenses of the trip, the captain's portion of the expenses would be carried over to succeeding trips to be deducted from the captain's share of the subsequent catches. The unpaid expenses were considered a personal obligation of the captain.

20. On occasion the plaintiffs would make an advance of money to captains out of their general funds with the understanding that it was a loan to be repaid. These loans were usually repaid

out of the captains' share from future catches. Advances to deckhands by the plaintiffs were made with the permission of the boat captain who was personally charged with its repayment. The captain in turn would charge the amount against the deckhand's share, which share had been agreed upon separately between the captain and his deckhands.

21. There was no express agreement specifying the extent to which plaintiffs had control over the fishing activities of the captains. It is clear that in fact, no actual control was exercised over the details, manner or methods employed by the captains and the crews.

22. The plaintiffs had no control over the crewmen, and did not attempt to exercise any control over their activities through the captains, nor did plaintiffs intend to reserve such exercise of control over them.

23. The plaintiffs' boats were not equipped with ship-to-shore telephones. They were equipped with radios which permitted contact with the boats only through a marine operator in the vicinity. Such contact between the plaintiffs and the boats was not frequent. The radio was used only for contact in case of emergencies, to ascertain weather conditions and the location of shrimp.

24. Each time and at the time a boat returned to port, the trip was over and the work of fishing on that trip was concluded. The catches, which were owned jointly by the captains (including their crew) and plaintiffs in the agreed proportions, were sold and the proceeds were divided.

25. Since shrimp is very perishable, it was in the interest of each party to make an immediate disposition of the catch upon reaching port.

26. While plaintiffs did not pay any captain a salary and did not guarantee any captain a profit from his fishing, plaintiffs did guarantee each captain a market for his part of the catch (if there was a catch) at the prevailing market price when brought to Aransas Pass, Texas. Each captain was thus assured that his part of the shrimp caught and brought to port would not be lost by spoilage.

27. On those occasions when captains decided to return and unload their catches at ports other than Aransas Pass, Texas, the captains would seek out a fish house where the best price was obtained and where the boats could be serviced with ice, fuel and provisions. It was the captains' prerogative to pay for these services and commodities out of the proceeds from the sale of the catch, or to charge them to the plaintiffs' credit. The captains may or may not have first called the plaintiffs and advised where the sales were being made. In the captains' discretion, settlements between the plaintiffs and captains were made at the fish house in the particular port whereby the captains and crews received their agreed share and the balance was forwarded to the plaintiffs. In this way fishing could continue at the existing fishing grounds without first returning to the home port at Aransas Pass, Texas. On other occasions the captains would cause the entire amount from the sale of the catch to be sent to the plaintiffs by the fish house who purchased the shrimp, and settlement would be deferred until the captain chose to make it.

28. The livelihood of a captain depended solely upon his initiative and skill as a fisherman coupled with the probables of weather and the run of the shrimp. He may have exerted his efforts for long or short periods of time and have no claim to earnings of compensation of any kind, while, on the other hand, he may have been well rewarded by a share of a large catch made in a short space of time.

29. The plaintiffs would usually have no written record of the identity of the crewmen on the vessels until the time of settlement. At the time of settlement, plaintiffs required the names of such crew members for the purpose of listing them on the appropriate records for State Unemployment Insurance and Federal Withholding and Social Security Tax purposes as re-

quired by the particular state and the Internal Revenue Service.

30. The arrangements between the plaintiffs and the captains contemplated a right reserved by the plaintiffs to control only the results of the fishing ventures and they interfered in the process to some degree to assure a proper result. The plaintiffs' primary interest was to obtain the largest catches of marketable fish possible. The manner, methods and details of conducting the fishing operation being the sole prerogatives of the captains, were conducted without interference by the plaintiffs.

31. There was no labor union contract in existence between the plaintiffs and the fishermen. The captains and crewmen were not members of a union. Each captain individually negotiated his contractual arrangements with the particular plaintiff-boatowner and the crewmen, in turn, negotiated their arrangements for work and compensation solely with the captains.

32. Neither the captain nor crewmen are required to sign articles defining the parties' duties and obligations. Nor is there a requirement that a ship's log be kept by the captains of the shrimp boats.

33. The plaintiffs' boats did not operate under pre-arranged time schedules of departure and arrival nor were plaintiffs' boats required to follow prescribed courses and routes usually present in other maritime enterprises.

34. The plaintiffs filed proper employment tax returns with the Internal Revenue Service during the period here in issue and paid employment taxes on the earnings of the captains and crewmen.

35. Plaintiffs filed claims for refund of their portion of the Federal Insurance Contributions Taxes and Federal Unemployment Taxes paid on the earnings of the captains and crewmen. The claims were disallowed by the Commissioner of Internal Revenue and this action, which followed, was timely filed.

36. There is no substantial evidence of any effort on the part of the plaintiffs to control the captains and crew members to such an extent that their status would be one of employee rather than one of independent demise charterer.

37. Finally, the degree of control exercised by the plaintiffs in the marketing of the product which was jointly owned with the fishermen was not such as to remove the relationship from that of independent demise charterer to that of employee.